UNITED STATES of America

v.

Joseph ALBERICI.

Crim. No. 82–267.

United States District Court,
E.D. Pennsylvania.

Aug. 9, 1985.

Stephen V. Wehner, U.S. Atty., Philadelphia, Pa., for plaintiff.

Nino V. Tinari, Richard Meltzer, Philadelphia, Pa., Timothy Gorbey, Chester, Pa., Edward H. Rubenstone, William R. Herman, Philadelphia, Pa., for defendant.

OPINION

LOUIS H. POLLAK, District Judge.

Pursuant to Federal Rule of Criminal Procedure 33, Joseph Alberici has moved for a new trial, principally on the ground that the government failed to disclose exculpatory evidence prior to Mr. Alberici's trial in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government has opposed Mr. Alberici's motion. In order to explore in depth Mr. Alberici's complex factual contentions and the legal arguments predicated thereon, I conducted an evidentiary hearing. The hearing was held at various dates between January 21, 1985 and February 21, 1985.[1] At the conclusion of the hearing, I directed the parties to file supplemental memoranda outlining their respective positions. Based on my review of these submissions, and of the entire record in this matter, I conclude that the defendant's motion for a new trial must be denied.

I. STATEMENT OF FACTS

A. *Procedural History*

This case arises out of an August 1977 fire which consumed the Jerry Lewis Theatre in Aston Township, Pennsylvania. The indictment charges that defendant, who was in the process of purchasing the theater,[2] hired Joseph Ditizio to set the fire in order that defendant might collect on certain recently purchased insurance policies. Defendant was charged with six counts of mail fraud for his part in this scheme, and after an eight-day trial in January 1983, he was convicted on all counts. On July 25, 1983, I granted defendant's motion for a new trial based on the discrepancy between the indictment's charge that defendant caused the relevant documents to be *delivered* by mail and my jury charge, in which I instructed the jury that

---

1. Because my calendar did not permit me to set aside an extended block of time for the hearing on defendant's motion, that hearing was held at such times as the parties and the court were available. Portions of the hearing were conducted on January 21, January 28, January 29, January 30, January 31, February 4, February 11, February 13, February 14, and February 21, 1985.

2. Defendant agreed to purchase the theater in May 1977. Settlement was scheduled to take place on August 10, 1977. During the period between May and August 1977, defendant purchased several insurance policies on the theater. According to defendant's testimony at trial, defendant purchased the insurance in advance of settlement on the advice of counsel that his interest was insurable and that purchasing insurance would be wise. Tr. Jan. 17, 1983 at 40. The fire took place on August 6; settlement ultimately took place on August 24. *Id.* at 49.

they could convict defendant if they found that he had caused the documents to be *deposited* in the mails. On September 2, 1983, in response to the government's motion to reconsider, I reinstated the guilty verdict as to count five of the indictment.[3] Defendant's conviction was affirmed by the Court of Appeals for the Third Circuit, 735 F.2d 1351, on May 15, 1984. The Supreme Court, — U.S. —, 105 S.Ct. 564, 83 L.Ed.2d 505 denied certiorari on December 3, 1984. Defendant filed his second motion for a new trial—which is now before me— on January 8, 1985.

### B. *Summary of the Evidence Adduced at Trial*

Defendant argues that his trial was tainted by the government's non-disclosure of a whole host of allegedly exculpatory items of potential evidence. Any evaluation of defendant's argument must, of course, rest on an understanding of the evidence produced against defendant at trial. Accordingly, I shall briefly review those portions of the evidence relevant to defendant's motion.

At trial, Joseph Ditizio testified that in July of 1977 defendant met with him to arrange to have the Jerry Lewis Theatre burned down. To this end, defendant gave Ditizio a key to the theater and agreed to pay $25,000 for the arson. Ditizio, according to his testimony, contacted Charles Allen and offered to pay Allen to help set the fire. Allen in turn enlisted Vincent Fardella in the scheme. On August 6, 1977, according to the testimony of each of the three arsonists, Ditizio, Allen and Fardella met to set the fire, using two 55-gallon drums of the chemical agent naphtha which had earlier been purchased.

Although Ditizio was the only government witness directly linking defendant to the arson, both Charles Allen and Vincent Fardella testified concerning the nature and execution of the alleged fraudulent scheme. Allen in essence confirmed Ditizio's testimony regarding the preliminary arrangements and the setting of the fire. Fardella, by contrast, initially testified that only he and Allen had set the fire, and that Ditizio did not accompany them to the theater on the day of the fire. Fardella changed his testimony on these points after the prosecutor used his grand jury testimony to refresh his recollection. In addition, Fardella testified that Allen had told him that the individual paying for the arson was a Sansom Street jeweler. Fardella further testified that he did not know defendant and had no knowledge of any connection between defendant and the fire.

William Merrill, III, whose home was within visual range of the theater, testified that on the afternoon of the fire he saw a white male, about twenty-five to thirty years of age, drive up in a 1970 Chrysler and enter the theater. Shortly thereafter, Merrill saw a fiery explosion which caused one of the building's walls to collapse.

Employees of the relevant insurers testified that, in the months immediately prior to the fire, defendant had purchased some $500,000 of insurance on the theater, an amount well in excess of the purchase price. A portion of this insurance was scheduled to expire only eight days after the fire. Shortly after the fire, defendant hired an adjuster to process his insurance claims; the resulting mailings provided the jurisdictional grounds for defendant's indictment.

Some time after the fire, according to Ditizio's testimony, defendant contacted Ditizio to tell him (1) that the government had

**3.** As to count five, the evidence established beyond a reasonable doubt that the item in question—a letter to the Curley Adjustment Company containing certain schedules of value in connection with the Jerry Lewis Theatre fire—was actually delivered by the mail. Accordingly, and since defendant did not object to the form of the charge at the time it was given, I found that reinstatement of the jury's verdict on that count was compelled by the Supreme Court's discussion of the harmless error doctrine in *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). *United States v. Alberici*, Criminal No. 82–267, Memorandum and Order at 3–5 (Sept. 2, 1983). At the same time, I concluded that the other arguments which defendant raised in his motion for a new trial were without merit. *Id.*

subpoenaed certain telephone records which would reveal a call to Ditizio, and (2) that Ditizio was to tell the authorities that the purpose of the call was to "arrange" parking tickets. The government introduced those telephone records into evidence.

The defense case consisted largely of the defendant's testimony, supplemented by a large number of character witnesses. Defendant testified that he became casually acquainted with Joseph Ditizio through the latter's brother Henry. Defendant further testified that, shortly before the Jerry Lewis Theatre fire, he and Henry Ditizio had a loud altercation in defendant's office. According to defendant, Henry Ditizio was furious because he believed defendant—who was reputed to have some influence with local politicians—was responsible for Henry Ditizio's loss of his lucrative position as a deputy constable. The altercation allegedly closed with Henry Ditizio's vow to "get" the defendant. Defendant's secretary testified briefly, corroborating defendant's statements regarding the altercation with Henry Ditizio. Defendant denied ever contacting Joseph Ditizio regarding the Jerry Lewis Theatre.

In rebuttal, the government called Henry Ditizio, who categorically denied defendant's account of the altercation in defendant's office. Henry Ditizio testified that he had indeed introduced defendant to his brother Joseph, but that his subsequent relations with defendant were inconsequential. In addition, Henry Ditizio testified that he had never been a deputy constable. On this point, his testimony was corroborated by the testimony of the supervisor of constables in Delaware County.

### C. Defendant's New Trial Motion

Defendant raises three distinct arguments in support of his renewed motion for a new trial. First, defendant argues that he was unconstitutionally deprived of the use of exculpatory evidence that the government failed to turn over to him prior to trial. The evidence whose non-disclosure allegedly requires a new trial relates principally to the three arsonists who testified at defendant's trial: Joseph Ditizio, Charles Allen, and Vincent Fardella. In each instance, defendant's exculpatory evidence is said to impeach the credibility of one or more of these government witnesses. Second, defendant argues that certain newly discovered evidence (specifically, the expert report of Dr. Grant Krow) entitles him to a new trial, because it calls into question the truthfulness of certain government testimony adduced at trial. Third and finally, defendant contends that the mailing for which defendant was convicted is insufficiently related to the alleged fraudulent scheme to support a conviction.

Following is a list of the evidentiary items on which defendant's new trial motion is based.[4] Included in this list are defendant's various *Brady* contentions as well as the Krow report:

1. *Ditizio's motions for severance and for dismissal due to pre-indictment delay.* On December 18, 1981, Ditizio moved, in connection with the government's criminal prosecution of him for the Jerry Lewis Theatre fire, for severance and for dismissal of the indictment due to pre-indictment delay. In these motions, Ditizio (through his counsel) alleged that he was unable completely to recall events of several years earlier due to his medical condition and was prejudiced thereby in his ability to conduct his defense.[5] Defendant argues that the averments in those motions undermine Ditizio's credibility as the key witness against defendant.

2. *Reports of polygraph examinations of Vincent Fardella.* Two polygraph examinations of Vincent Fardella were taken, in September 1981 and December 1982. At the September 1981 examination, Fardella

---

4. On June 26, 1985, defendant submitted a letter brief which raised additional *Brady* issues. This submission is discussed *infra* at note 23.

5. Ditizio later pleaded guilty to charges arising out of the Jerry Lewis Theatre fire. Tr. Jan. 5, 1983 at 267–70.

told the examiner that he and Allen had set the Jerry Lewis Theatre fire, and that Ditizio had not been a participant in the arson. The examiner concluded that Fardella's account was not truthful. At the December 1982 examination, Fardella was questioned regarding other arsons in which he was a suspect (and about which the government had previously examined Charles Allen); the examiner concluded that his answers were truthful. Defendant contends that neither polygraph examination was disclosed. The September 1981 examination, defendant argues, serves to exculpate Ditizio and therefore defendant, since Ditizio was the sole link between defendant and the arson. Defendant argues that the December 1982 polygraph suggests that the government believed Charles Allen to be an unreliable witness, a belief which the government never disclosed to defendant.

3. *Fardella's August 1981 oral statement exculpating Ditizio.* At an off-the-record interview of Fardella conducted by government counsel in August 1981, Fardella stated that he and Charles Allen committed the Jerry Lewis Theatre arson by themselves, without the involvement of any third person. Here again defendant contends that Fardella's exculpation of Ditizio is also exculpatory with respect to defendant.

4. *The government's letter to Fardella's counsel establishing "ground rules" for an off-the-record conversation with Fardella in August 1981.* In an August 10, 1981 letter to Fardella's counsel, the prosecutors made arrangements for the interview mentioned in the preceding paragraph. The letter set forth a number of terms under which the interview would be held, including (1) the promise that nothing Fardella would say would be used against him in any subsequent criminal prosecution, and (2) the warning that the government would use Fardella's statements to impeach him if he should give materially different testimony at a later date. Defendant argues that the August 1981 letter tends to show that statements made at the subsequent interview were truthful. Since,

as we have seen, Fardella exculpated Ditizio at the subsequent interview, the letter would, the argument goes, bolster the inference that Ditizio was not involved in the arson.

5. *The transcripts of Fardella's plea and sentencing in the New Jersey prosecution.* In December 1982, Fardella pleaded guilty to, and was sentenced for, federal charges arising out of an arson in New Jersey. Defendant claims that the transcripts of the plea and sentencing, which were not disclosed to defendant prior to defendant's trial, establish that the government accepted as truthful Fardella's earlier exculpation of Ditizio.

6. *The Dangerous Special Offender Petition which the government filed in the course of its prosecution of Fardella.* On February 19, 1982, the government petitioned this court to sentence Vincent Fardella as a dangerous special offender in the prosecution arising out of the Jerry Lewis Theatre fire. This petition was withdrawn following Fardella's sentencing; defendant claims that neither the petition (which contains information which might have been used to impeach Fardella) nor its withdrawal (which might suggest a motive for Fardella to testify against defendant) was disclosed to defendant.

7. *Fardella's motions to dismiss his indictment based on prosecutorial misconduct.* On August 19 and September 7, 1982, Fardella filed two motions to dismiss the indictment brought against him in this district in connection with the Jerry Lewis Theatre fire. The first motion alleged that the government was seeking to punish him for his efforts to secure early release from prison (he was then serving time for another offense); the second alleged that the government violated his plea agreement by using certain statements against him in a federal prosecution arising out of the New Jersey arson. Both motions, according to defendant, suggest that the government had applied considerable pressure to Fardella in connection with his testimony in defendant's case. Thus, the argument

goes, both motions undermine Fardella's credibility and, to a lesser extent, the credibility of the other government witnesses (since the motions suggest that the government put pressure on its witnesses as a general matter).

8. *Witness statements from the Merrills and from Richard Weller regarding their description of the car they saw near the theater the day of the fire.* In a statement taken by the government shortly after the fire, William Merrill III, who lived near the Jerry Lewis Theatre, described the car which he saw at the theatre at the time of the fire as light blue, with the word "MOPAR" on the back of the car. The government also took the statement of Richard Weller, who had been jogging in the neighborhood at the time of the fire and observed a light blue car with a green-and-white license plate. The government concedes that these statements were not disclosed to the defendant prior to trial. In addition, through post-trial interviews had with Mr. Merrill and with his parents, defendant learned that (1) none of them identified Fardella, Allen, or Ditizio as a person seen on the day of the fire, and (2) all three stated that the person[s] seen was/were approximately twenty-five to thirty years of age. Fardella, Allen, and Ditizio were all substantially older than thirty at the time of the fire.

Defendant argues that the statements contradict the testimony of Fardella and Allen, both of whom testified that Fardella's car was the getaway car. Although no one testified at the trial concerning the color of the getaway car, there was testimony at the hearing on defendant's current motion for a new trial which suggested that Fardella's car was a gold Chrysler. Defendant further argues that the Merrills' failure to identify any of the supposed arsonists supports the inference that someone else was involved in the arson, and that Fardella, Allen, and Ditizio were concealing the identity of this mystery person or persons.

9. *Transcripts of Allen's testimony in United States v. Boffa.* Defendant alleges, and the government concedes, that transcripts of Charles Allen's testimony in a federal criminal trial in the United States District Court for the District of Delaware were not disclosed to the defendant. The transcripts in question contain admissions of both murder for hire and repeated perjury by Allen. Defendant argues that these admissions are strong impeachment evidence as to a critical government witness.

10. *The failure of Theodore Teplick (who allegedly sold naphtha to the arsonists) to identify either Fardella or Allen in a photographic spread.* The government concedes that Teplick, when interviewed by a government agent in 1979, failed to identify any of the arsonists when shown a photographic display. Defendant contends that this information was not disclosed prior to trial, and that it serves to undermine Fardella's and Allen's testimony. Teplick was not permitted to testify at trial, because (apparently through the inadvertence of government counsel) he was present in court during portions of other witnesses' testimony.

11. *Dr. Krow's report regarding the alleged use of large amounts of naphtha in the Jerry Lewis Theatre fire.* Defendant has, since the conclusion of his trial, commissioned a report by Dr. Grant Krow, which suggests that Allen's and Fardella's account regarding the amount of naphtha used to set the fire could not have been correct. In particular, Dr. Krow's report calls into question the testimony regarding the use of two 55–gallon drums of the chemical agent naphtha—an amount which, according to Dr. Krow, would have caused more extensive destruction than that which actually occurred. Dr. Krow's report further suggests that the chemical agent used in the Jerry Lewis Theatre fire was not naphtha but phenol.

## II. THE LEGAL BACKGROUND

Defendant's motion involves two bodies of doctrine: (1) the government's duty to disclose evidence favorable [6] to defendants

6. In *United States v. Bagley,* —— U.S. ——, ——, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), the

prior to trial, *see United States v. Bagley,* — U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),[7] and (2) the requirements imposed by Rule 33 on a defendant seeking a new trial based on newly discovered evidence, *see United States v. Adams,* 759 F.2d 1099, 1108 (3d Cir.1985).[8]

### A. The Reformulation of Brady

Under the *Brady/Agurs* test, claims of nondisclosure of evidence were sorted into three categories: (1) nondisclosure of the use of perjured testimony; (2) nondisclosure following a request for specific evidence favorable to the defendant ("specific request"); (3) nondisclosure following a request for any evidence favorable to the defendant ("general request") or nondisclosure in the absence of any request by the defendant ("no request"). The standard that applied to claims where a specific request was made was different than that for claims where either a general request or no request was made, or that for perjured testimony. *Agurs,* 427 U.S. 97, 103–14, 96 S.Ct. 2392, 2397–2402, 49 L.Ed.2d 342 (1976). In *Bagley,* the Court replaced the different standards developed under *Brady* and *Agurs* for at least two of these categories, ("specific request" and "general or no request") with a single test "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused..." — U.S. at ——, 105 S.Ct. at 3384.[9] Under the new *Bagley* standard, "evidence is material only if

Supreme Court, noting that the Ninth Circuit "treated impeachment evidence as constitutionally different from exculpatory evidence," made clear that "[t]his Court has rejected any such distinction between impeachment evidence and exculpatory evidence." Accordingly, I will refer to evidence relevant to a *Bagley/Brady* claim for pretrial disclosure as "evidence favorable to the defendant," without specifying whether that evidence is relevant to the credibility of witnesses or to the guilt of the defendant.

**7.** In *United States v. Oxman,* 740 F.2d 1298, 1306–17 (3d Cir.1984), the Third Circuit recently reviewed the *Brady* doctrine. But, subsequent to *Oxman,* the Supreme Court, in *Bagley, supra,* also reexamined *Brady* and its sequelae, and thereupon vacated and remanded *Oxman* for reconsideration in light of *Bagley, sub nom. United States v. Pflaumer,* — U.S. ——, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985).

**8.** A third body of doctrine, perhaps relevant here, is that a criminal conviction should not be overturned due to error—even, in some instances, error of constitutional dimensions—when that error is harmless. *See United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The continuing relevance of this doctrine to *Brady* claims is uncertain because those Parts (I and II) of Justice Blackman's opinion in *Bagley, supra,* joined by a majority of Justices do not address this issue. While the precise status of the harmless error standard may be ambiguous, this ambiguity has no practical effect on this case. The standard for harmless error is similar to the new standard for materiality under *Bagley.* Thus, where I find that the Government failed to disclose evidence favorable to the defendant, but that this evidence was not "material" in the new sense ascribed to that term in *Bagley,* I would also conclude that such nondisclosure was harmless error under *Hasting* and *Chapman. Cf.* note 9.

**9.** It is not clear whether the Court intended to subsume the prosecutor's knowing use of or failure to disclose perjured testimony under this new test, or whether the old test is still applicable. The old rule, recapitulated in *Agurs,* was that "a conviction obtained by the knowing use of perjured testimony ... must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (footnotes omitted). Footnotes 8 and 9 and the accompanying text of Justice Blackmun's opinion describe the rule for perjured testimony before *Bagley,* and this description, together with the passage just quoted, may be read to leave the rule for perjured testimony undisturbed. That is how Justice Stevens, at least, has read it. *See* — U.S. at —— n. 6, 105 S.Ct. at 3400 n. 6 (Stevens, J., dissenting). Justices White and Rehnquist, and Chief Justice Burger would, however, extend the *Bagley* formula "to cover all instances of prosecutorial failure to disclose evidence favorable to the accused." — U.S. at ——, 105 S.Ct. at 3384 (White, J., joined by Burger, C.J., and Rehnquist, J., concurring in part and in the judgment). Since perjured testimony is not at issue in this case, I need not resolve the question of *Bagley*'s impact on the standard for perjured testimony.

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [10]

In reformulating a single test for all specific or general *Brady* requests, however, the Court apparently did not mean to suggest that situations in which the defendant did make a specific request necessarily had to be treated identically to those situations in which the defendant made a general request or no request whatsoever. The Court did not articulate a precise standard, however, that courts should employ in assessing the significance of nondisclosure following specific requests. Instead, it apparently consigned such evaluation to the reviewing court's discretion, that discretion being limited, of course, by the *Bagley* standard. The *Bagley* Court treats the issue of specific requests in the following way.

Justice Blackmun, joined by Justice O'Conner, noted that the Government had conceded that "a materiality standard more favorable to the defendant might reasonably be adopted in specific request cases." —— U.S. at ——, 105 S.Ct. at 3384 (Opinion of Blackmun, J., joined by O'Connor, J.). A prosecutor's failure to respond to a specific request not only deprives the defendant of the requested evidence, but it also suggests

to the defendant that the evidence does not exist, and may lead defense counsel to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *Id.* Because of the potentially damaging effects such actions could have on the adversary system, Justice Blackmun went on to suggest that courts employ the flexibility inherent in the new materiality standard to evaluate:

> any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Id.*

In a concurrence joined by Chief Justice Burger and Justice Rehnquist, Justice White declined to support Justice Blackmun's elaboration of a "totality of the circumstances" approach to cases involving requests for specific evidence. He did, however, endorse Justice Blackmun's characterization of the standard as a "flexible" one, and appeared to suggest that any elab-

---

**10.** In his concurrence, Justice White, joined by Chief Justice Burger and Justice Rehnquist, quoted with approval the first sentence of this formulation, but did not mention the second. The second sentence, which defines "reasonable probability," falls in Part III of Justice Blackmun's opinion, in which Justices White and Rehnquist and Chief Justice Burger did not concur. There is some question, therefore, whether this definition of "reasonable probability" carries the support of a majority.

In this regard, it may be instructive to note first that no other definition of the term is offered by the concurring Justices, and that their objection to Part III appears to go to the paragraphs following the definition, where Justice Blackmun "attempt[s] to elaborate on the relevance to the inquiry of the specificity of the defense's request for disclosure, either generally or with respect to this case." —— U.S. at ——, 105 S.Ct. at 3385 (White, J., joined by Burger,

C.J., and Rehnquist, J., concurring in part and in the judgment). In addition, I note that a majority of the Court does concur in Part II of Justice Blackmun's opinion, the last sentence of which contains a broad statement of the meaning of material evidence in determining constitutional errors that require reversal of convictions: "[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material *in the sense that its suppression undermines confidence in the outcome of the trial.*" —— U.S. at ——, 105 S.Ct. at 3381 (emphasis added). The definition of "reasonable probability" in Part III closely tracks this language. Absent more explicit instruction from the Court, I will assume therefore that a majority of the Justices would have the lower courts understand the phrase "reasonable probability" to mean "a probability sufficient to undermine confidence in the outcome."

oration of the implications of this flexibility should be left to the lower courts to determine in accordance with the facts before them. *Id.* (White, J., joined by Burger, C.J., and Rehnquist, J., concurring in part and concurring in the judgment).

Justice Marshall, joined by Justice Brennan, dissented in *Bagley,* and made clear that he thought that the Constitution afforded greater protection to defendants who made requests for specific evidence than the flexible standard adopted by the majority. *Id.* at ——–——, 105 S.Ct. at 3389–97 (Marshall, J., joined by Brennan, J., dissenting). Justice Stevens also dissented, arguing in part that the majority's reformulation of the *Brady* standard did not adequately address the harmful effects to the adversary system that stem from a prosecutor's failure to respond to a defendant's request for specific evidence. *Id.* at ——, 105 S.Ct. at 3399 (Stevens, J., dissenting).

At the very least, then, five Justices (Blackmun, O'Connor, Marshall, Brennan, and Stevens) see a particular need to address the potentially harmful effects of a failure to disclose evidence in response to a request for specific evidence, and five Justices (Blackmun, O'Connor, White, Burger, and Rehnquist) see the new *Bagley* materiality test as a test sufficiently flexible to accommodate the implications of a specific request. Accordingly, in Part III of this opinion, I will indicate which of defendant's *Brady* claims involved a request for specific evidence, and I will consider determining whether, had the evidence been disclosed, the result of the proceeding would have been different.[11]

▮ Finally, in this case, the government argues vigorously that defendant must, in order to obtain the relief he seeks, establish that he was diligent in his efforts to uncover the evidence prior to his trial. In light of the "sufficiently flexible" test developed in *Bagley,* however, courts need

no longer evaluate defendants' efforts to obtain the evidence in question. Under *Bagley,* a *Brady* violation occurs where the Government does not disclose evidence, and "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* —— U.S. at ——, 105 S.Ct. at 3384. It makes no difference whether the defendant might, through diligent research or investigation, have obtained the evidence on his own: Since the prosecutor already has the evidence, his obligation to seek impartial justice requires that he share it with the defendant. As the Supreme Court stated in *Agurs:*

> [T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request. For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that "justice shall be done."

427 U.S. at 110–11, 96 S.Ct. at 2401 (1976). Any violation of the prosecutor's duty to disclose evidence favorable to the defendant necessitates a new trial, unless that evidence is not material as defined in *Bagley.*

**B.** *Rule 33*

▮ Under Federal Rule of Criminal Procedure 33, a defendant may obtain a new trial when newly discovered evidence casts substantial doubt on the accuracy of the factfinder's determination. This addresses those rare instances in which critical exculpatory evidence is unknown to both the government and the defendant until after the trial is concluded. In order to obtain relief in such instances, movants must meet the following five-part test:

(a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the

---

11. Such an approach is, at the very least, not inconsistent with what the Court reminded us was the basic purpose of *Brady,* which is "not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." —— U.S. at ——, 105 S.Ct. at 3380 (footnote omitted).

court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Iannelli,* 528 F.2d 1290, 1292 (3d Cir.1976) (quoted in *United States v. Adams, supra,* at 1108). Sensibly enough, when a defendant seeks relief under Rule 33, he must show, *inter alia,* that he was diligent prior to trial—otherwise, defendants could in effect save themselves the effort of investigation, anticipating the opportunity to present newly found evidence after trial. "Defendant is not permitted to change his strategy after an unfavorable verdict and use evidence he chose not to present at the trial." 3 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 557, at 317–19 (1982). In addition, in the interest of finality, a defendant seeking Rule 33 relief must show that the evidence in question "would probably produce an acquittal." *United States v. Iannelli,* 528 F.2d 1290, 1292 (3d Cir.1976); *United States v. Adams, supra,* at 1108. Thus, the "harmless beyond a reasonable doubt" standard of *Chapman v. California, see supra* note 8, has no application to a Rule 33 motion based on newly discovered evidence: A defendant must, in order to establish his entitlement to relief under the Rule, show that the new evidence would *probably* change the outcome.

C. *The Standards Applicable to this Case*

All but one of the eleven evidentiary arguments which defendant raises in his motion are properly understood as *Brady* arguments.[12] In evaluating defendant's

*Brady* claims, I must first ask (1) whether the evidence was not in fact disclosed, and (2) whether the evidence is favorable to the defendant. As to those items that were not disclosed and that are favorable to the defendant, I must then determine whether the evidence was material under *Bagley.* As discussed above, I will give such weight to the fact that some items were specifically requested as the circumstances warrant.

The one evidentiary argument that does not fall within this category concerns the report of Dr. Grant Krow, which, according to defendant, suggests that Fardella's and Allen's accounts of the fire were inaccurate. Neither defendant nor the government possessed Dr. Krow's report prior to trial. Accordingly, that portion of defendant's motion that concerns Dr. Krow's report will be evaluated under the requirements of Rule 33 motions based on newly discovered evidence.

Keeping in mind the general principles outlined above, I proceed to consider the merits of defendant's *Brady* and Rule 33 arguments.

## III. CONSIDERATION OF THE MERITS

### A. *Alleged Brady Violations*

Keeping in mind that the same materiality standard applies to all of defendant's *Brady* claims, I note at the outset which of the items were specifically requested, so that I can accord such weight to that fact in determining the materiality of the withheld evidence as the circumstances warrant. Defendant has submitted copies of the detailed requests for discovery which were made prior to trial; these requests clearly include such items as polygraph examinations and oral and written witness statements which might exculpate defendant. *See* Letter from Nino V. Tinari to Stephen V. Wehner (Sept. 9, 1982) (at-

**12.** Defendant's motion asserts that he is entitled to relief "pursuant to Rule 33 of the Federal Rules of Criminal Procedure." The bulk of defendant's motion, however, raises constitutional issues more appropriately decided under 28 U.S.C. § 2255 than under the restrictive standard of Rule 33. *Compare United States v. Adams, supra,* at 1108 (describing five-part test for establishing entitlement to relief under Rule

33) *with id.* at 1108 (applying different standard to *Brady* claims). Because it would serve no purpose to require defendant to resubmit his motion—bringing constitutional claims under section 2255 and non-constitutional claims under Rule 33—I shall, for purposes of my decision in this case, treat defendant's motion as if it were so filed in the first place.

tached as Exhibit 1 to defendant's new trial motion); Defendant's Motion for Disclosure of Evidence Favorable to the Accused (attached as Exhibit 2 to defendant's new trial motion); Defendant's Motion for Discovery and Inspection (attached as Exhibit 3 to defendant's new trial motion).

██ That is not the case as to the other items in defendant's list. Items one, six, and seven are all motions filed in criminal cases brought against Ditizio and Fardella. The closest thing to a specific request by defendant for such materials is his request for the criminal records of all government witnesses. Defendant does not, however, allege that the government failed to supply Ditizio's or Fardella's criminal record, presumably including the record of the prosecutions arising out of the Jerry Lewis Theatre fire. Rather, defendant alleges that the government failed to supply copies of particular motions filed in those prosecutions. The government cannot reasonably be faulted for not construing a request for criminal records as a request for the entire contents of the official file in every criminal case brought against one of its witnesses. Accordingly, I do not find that defendant specifically requested evidence in the Ditizio and Fardella criminal files prior to trial.

The same is true of items five and nine, which are, respectively, the transcripts of Fardella's plea and sentencing before Judge Gerry in the United States District Court for the District of New Jersey, and the transcripts of Charles Allen's testimony in *United States v. Boffa,* a federal criminal case brought in Delaware. In neither instance does the material in question relate directly to defendant's case or to the Jerry Lewis Theatre fire. And once again, defendant has not pointed to any request which would put the government on notice that transcripts of unrelated criminal proceedings were being sought. Therefore, I do not find that defendants specifically requested items one, five, six, seven, and nine.

(1) *The motions for severance and dismissal due to pre-indictment delay.* In December of 1981, in the course of criminal proceedings against Ditizio for his part in the Jerry Lewis Theatre fire in the summer of 1977, Ditizio, who was represented by counsel at the time, filed motions for severance and for dismissal due to pre-indictment delay. In these motions, Ditizio alleged that he was "unable to recall his whereabouts on the date in question or other dates as indicated in the Overt Acts charged," [13] and that "it may well be that he has sustained multiple small cerebral emboli which might well have had an adverse impact on [his] ability to recall events of several years ago." [14] Ditizio's alleged inability in 1981 to recall events that took place in 1977 would be relevant and exculpatory with respect to the charges against defendant Alberici. A demonstration of Ditizio's alleged failure of memory would tend to undermine Ditizio's rather detailed account of his relations with the defendant in the summer of 1977. Nor does the government argue that these motions were in fact turned over to the defense; rather, the government contends that they duplicated information the defense already possessed. To support this contention, the government points to the transcript of defendant's trial, in which the following colloquy between defendant's counsel and Ditizio took place:

Q: You take quite a few kinds of medications; is that correct?

A: . Yes, I do.

Q: Those medicines that you take today, do they affect the way you think, cause any cloudiness in your mind or confusion at times because of the interaction of all these medicines?

A: Not noticeably.

Q: Do you have any recollection whether or not even back in 1977 or 1978 or up

---

**13.** Motion for Severance ¶ 5 (Dec. 18, 1981) (attached as Exhibit 12 to defendant's new trial motion).

**14.** Motion to Dismiss for Pre-Indictment Delay ¶ 4 (Dec. 18, 1981) (attached as Exhibit 15 to defendant's new trial motion).

until the present time as you're testifying in the interaction of those drugs, the medications that you take would cause a lapse of memory or anything of that nature?

A: I don't know. I don't exactly follow the question.

Q: What I'm trying to get at is these medicines that you take, do they cause any reactions within you that may cause your thinking process in any way to be in a condition that you would either forget something, add something or—

A: Not noticeably. I don't know....

Q: Mr. Ditizio, these medications that you take, these drugs, how many kinds of drugs do you take per day without giving us the names, just the amounts?

A: I have to think because I take quite a few. I don't know. Roughly around 20 different pills.

Q: Every day?

A: Yes.

Tr. Jan. 6, 1983 at 10–12. As this passage shows, the defense was cognizant of Joseph Ditizio's medical difficulties and sought to use them to cast doubt on Ditizio's credibility as a witness. But it does not follow from defendant's knowledge of Ditizio's medical difficulties that the government had no obligation to disclose Ditizio's statement that he had difficulty remembering events at the time of the fire. Such a statement does more than merely confirm the fact that Ditizio had medical problems—it affirmatively suggests that Ditizio believed those problems affected his memory. And since Ditizio was the witness who placed Alberici in the fraudulent scheme to burn the Jerry Lewis Theatre, an acknowledged failure of Ditizio's memory would clearly be favorable to Alberici.

■ I therefore conclude that the contents of Ditizio's pretrial motions were relevant, exculpatory, not disclosed to the defense prior to trial, and not duplicative of information the defense already possessed. The remaining issue is whether the Ditizio motions are material. Under the applicable materiality standard, Ditizio's pretrial motions are not material unless their disclosure creates a reasonable probability that the outcome of the trial would have been different.

The motions do not satisfy this standard. As to Ditizio, the allegations contained in the motions are patently self-serving, thereby reducing their weight for purposes of cross-examination. The allegations were made at a time when Ditizio was contesting the charges against him in connection with the Jerry Lewis Theatre; he later pleaded guilty to those charges. They therefore add little weight to the data which defendant concededly had concerning Ditizio's medical condition. Consequently, I find that the allegations regarding Ditizio's memory loss were not, viewed prospectively, sufficient to create a reasonable doubt as to defendant's guilt. It follows that their non-disclosure did not deprive defendant of due process of law.

(2) *The reports of Fardella's polygraph examinations.*

Defendant's argument with regard to the Fardella polygraphs rests on several misconceptions.

■ First, the transcript of defendant's trial confirms that the defense in fact knew of the statements which Fardella made in the course of his September 1981 polygraph. Tr. Jan. 10, 1983 at 113–114. Nor is there any exculpatory information contained in the September 1981 polygraph report *apart from* Fardella's responses to the questions. Indeed, at the hearing on the instant motion, the agent who conducted that polygraph examination testified that Fardella's responses were not truthful. Tr. Jan. 28, 1985 at 10–11 (testimony of Agent O'Reilly).[15] Consequently, I find

---

**15.** Defendant nevertheless argues that the government violated its obligations under *Brady* by failing to turn over the complete polygraph report. At the hearing on defendant's motion, the agent who conducted the polygraph examination testified that the report in defendant's possession was missing one page. Tr. Jan. 28, 1985 at 8. It appears that the page was inadvertently omitted when the report was xeroxed. Further testimony established that, sometime

that the materials concerning the September 1981 polygraph not disclosed to the defense were not exculpatory.

The testimony regarding the December 1982 polygraph examination similarly fails to reveal how the report of that examination was favorable to the defendant. In December 1982, Fardella was examined concerning arsons other than the Jerry Lewis Theatre fire. Some of these other arsons also involved Charles Allen. Defendant argues that the fact that the government examined Fardella shows that the government lacked confidence in the truthfulness of information that Allen had supplied regarding these other arsons. Defendant does not, however, point to any particular answers that Fardella gave which constitute impeachment evidence as to Allen or as to Fardella.

For these reasons, I do not find the material regarding the Fardella polygraphs to be favorable to the defense. Assuming defendant's allegations concerning their non-disclosure are correct, their non-disclosure did not violate due process.

■ (3) *Fardella's August 1981 oral statement exculpating Ditizio.* In August 1981, Fardella told the government that Joseph Ditizio was not involved in the Jerry Lewis Theatre arson. It is clear that this statement was favorable to defendant, for, if believed, it would eliminate from the fraudulent scheme the one participant who could tie defendant to that scheme. It is also clear, however, that the defense was aware that Fardella had made statements exculpating Ditizio. *See* Tr. Jan. 10, 1983 at 111–12 (cross-examination of Vincent Fardella at defendant's trial); Tr. Feb. 21, 1985 at 24–25 (testimony of defendant's trial counsel); Tr. Jan. 28, 1985 at 71 (testimony of government's trial counsel). Counsel who represented Defendant at trial testified that, although he was aware that Fardella had made more than one statement exculpating Ditizio, he conscious-

ly chose not to invoke more than one prior statement · at trial as a tactical decision. Tr. Feb. 21, 1985 at 24. While this does not establish that the particular statements made to the government in August 1981 were known to the defense, it does establish that the defense knew that Fardella had, in the past, made statements to the effect that Ditizio was not involved in the Jerry Lewis Theatre fire. *Id.* Tr. Jan. 28, 1985 at 71. Assuming that the particular statement made in August 1981 was not disclosed to the defense, the statement cannot be considered material under *Bagley:* The substance of the statement was already known to the defense at the time of defendant's trial, and so any failure of the prosecution to disclose the actual statement cannot reasonably be said to have led to a different outcome.

■ (4) *The government's letter to Fardella's counsel establishing "ground rules" for the August 1981 conversation with Fardella.* It is conceded that the letter to Fardella's counsel which preceded the August 1981 discussion was not disclosed to the defense. In addition, it is clear that the contents of that letter— which provided for limited immunity for Fardella from prosecution based on statements made during the course of the discussion—served to enhance the reliability of statements which Fardella might make. *United States v. Ditizio*, 530 F.Supp. 175, 177–78 (E.D.Pa.1982) (discussing the letter in the context of Ditizio's motion to sever). The information contained in the letter is, in short, exculpatory as to defendant Alberici. Consequently, defendant argues, disclosure of the letter would have prompted defense counsel to alter the course of his cross-examination of Fardella, to emphasize more strongly Fardella's prior exculpation of Ditizio.

This argument is directly contradicted by defendant's trial counsel. At the hearing on the instant motion, trial counsel testified

after defendant's trial, the original of the report, which was in the files of the Bureau of Alcohol, Tobacco and Firearms, was inadvertently destroyed, along with thousands of other Bureau

documents. *Id.* at 9, 33. There was, however, *no* testimony that would support the inference that the missing page was in any way favorable to the defense.

that disclosure of the letter would have made no difference whatsoever to the defense. Tr. Feb. 13, 1985 at 68. Defendant argues that his trial counsel's testimony on this point is not credible, given the obvious value of the information contained in the letter.

I need not determine whether in fact the letter would have been used in the defense case had it been turned over, because I find that, in either event, the non-disclosure of the letter had no effect on the outcome. The cross-examination of Fardella at trial made clear that Fardella had, prior to trial, made statements to the effect that Ditizio was not part of the Jerry Lewis Theatre arson. Moreover, Fardella testified *at the trial* that at one point Charles Allen told him that a Sansom Street jeweler was the motivating force behind the arson. Jan. 10, 1983 at 80. The added effect of an additional statement exculpating Ditizio, even with the reinforcement of limited immunity for the statement, would not have altered the outcome.

■ (5) *Transcripts of Fardella's sentencing in the New Jersey prosecution.* Defendant contends that transcripts of Fardella's sentencing in a New Jersey federal court in 1982 reveal that the government believed Fardella's exculpation of Ditizio was truthful. During the course of the sentencing, Fardella's counsel made reference to a polygraph examination which Fardella allegedly "passed . . . with flying colors." *United States v. Fardella,* Criminal No. 82–214, Transcript of Sentencing (Dec. 10, 1982). Defendant argues that this comment referred to the September 1981 polygraph examination, in which Fardella said that Ditizio was not involved in the Jerry Lewis theatre fire.

The government has submitted the affidavit of Cecilia Gardner, Fardella's prosecutor in the New Jersey case. Ms. Gardner's affidavit establishes that any references in the New Jersey case to a polygraph examination concerned the December 1982 examination, at which Fardella was questioned regarding other arsons. Because there is nothing on this record that would suggest that Fardella's December 1982 polygraph examination was favorable to the defendant, the non-disclosure of the sentencing transcript did not deprive defendant of due process of law.

(6) *The Dangerous Special Offender petition, Fardella's motions to dismiss the indictment for prosecutorial misconduct, and the Merrill and Weller witness statements.* The Dangerous Special Offender petition which the government filed in the *Fardella* /Jerry Lewis Theatre prosecution, Fardella's pretrial motions in that case, and the witness statements of William Merrill, III, and Richard Weller all go to Fardella's overall credibility as a witness in defendant's trial. Defendant argues that the filing of the Dangerous Special Offender petition, together with its withdrawal shortly before defendant's trial, shows that the government exerted enormous pressure on Fardella to cooperate in defendant's case.[16] This inference is, the argument goes, corroborated by Fardella's two motions to dismiss the indictment against him, both of which alleged various sorts of prosecutorial misconduct. As to the statements of William Merrill, III, and Richard Weller, these assertedly contradict Fardella's version of the arson: Both Merrill and Weller claim to have seen a light blue car at the theater at the time of the fire, while the car Fardella claimed to have used in setting the fire was gold.[17]

16. Based on the evidence introduced at the hearing on defendant's motion, it appears that defense counsel knew of both the existence and the contents of the Dangerous Special Offender petition prior to trial. Letter from Stephen V. Wehner to Timothy J. Gorbey and Nino V. Tinari (Dec. 28, 1982); Tr. Feb. 13, 1985 at 63 (testimony of defendant's trial counsel).

17. It is unclear from defendant's memorandum whether he also. alleges that the government failed to disclose records tending to show that Fardella did not in fact own the purported getaway car at the time of the fire, but received title to it some thirteen months later. In any event, the evidence adduced at the hearing on defendant's motion establishes that the defense did in fact receive this information. Tr. Feb. 13, 1985 at 5–6; Government's Exhibit 11.

Inasmuch as the government is under no duty to disclose items that might impeach the testimony of a witness whose testimony is either neutral or favorable to the defendant, the failure to employ such impeachment evidence must inevitably be harmless, since the witness whose testimony was not impeached did not in any way harm the defendant's case. The government argues that Fardella was such a witness: Fardella acknowledged that he did not know and had never seen defendant, and Fardella testified that Allen had told him that a jeweler on Sansom Street had ordered the arson. Tr. Jan. 10, 1983 at 80. For these reasons, defense counsel viewed Fardella as in substance a defense witness at trial. Tr. Feb. 13, 1985 at 61.

Based on my review of the record in this case, I find the government's argument persuasive. Fardella's testimony in no way linked defendant to the Jerry Lewis Theatre arson—indeed, as the government correctly notes, Fardella suggested that someone other than defendant played the role with which defendant was charged. Fardella's testimony was thus wholly unhelpful to the government in terms of establishing defendant's complicity in the fraudulent scheme. The relevance of his testimony was in establishing that there was in fact an arson that involved Fardella, Charles Allen, and Joseph Ditizio. In this limited sense, Fardella's testimony was inculpatory, for it established the arson that defendant was charged with ordering, as well as the cast of characters through whom those orders were allegedly carried out. However, defendant did not at trial mount any serious challenge either to the fact of an arson or to the involvement of Fardella, Allen, and Ditizio.[18] Further, the record before me provides no basis for supposing that, based on the undisclosed evidence that gave rise to defendant's motion, defendant could seriously dispute the fact that Fardella, Allen, and Ditizio—all of whom pleaded guilty to charges arising out of the case, and all of whom provided detailed and complementary accounts of the planning and execution of the arson—conspired to burn the Jerry Lewis Theatre. Consequently, I find that, assuming the above-listed items were not disclosed to the defense prior to trial, there is no reasonably probability that their disclosure would have led to a different result.

(7) *The failure of William Merrill, III, or his parents to identify either Fardella, Allen, or Ditizio as an arsonist; and Mrs. Merrill's statement that the arsonists were approximately thirty years old.* The government concedes that, shortly after the Jerry Lewis Theatre fire, William Merrill, III, and his parents failed to identify either Fardella, Allen, or Ditizio as a person they had seen at the theater at the time of the fire. In addition, the government has not challenged defendant's assertion, supported by handwritten notes of the agent who conducted the interview, that both William Merrill, Jr. and Gladys Merrill stated that the persons they saw were approximately twenty-five to thirty years of age. Finally, it is uncontradicted that these facts were not disclosed to the defense prior to defendant's trial.

It is clear that these eyewitness statements are both relevant and potentially exculpatory. They go to the question whether Fardella, Allen, and Ditizio actually committed the arson. Had defendant been able to establish that the arson was in fact committed by some person or persons other than the three individuals who confessed to its commission, defendant would, of course, have cast considerable doubt on the existence of the scheme that he was charged with initiating.

Like the items discussed in subsection (6) above, however, I find that pre-trial disclosure of the Merrills' statements regarding the identities of the arsonists would not have led to a different result. The evidence of an arson carried out by Ditizio, Allen, and Fardella was overwhelming. Each of the three arsonists testified in great (and, in general, consistent) detail

---

18. During his closing argument at Alberici's trial, defense counsel conceded that Fardella, Allen, and Ditizio committed the arson. Tr. Jan. 18, 1983 at 47.

about the events leading up to the Jerry Lewis Theatre fire; each pleaded guilty to his own participation in that fire. In light of that evidence, the Merrills' statements, apparently based on fleeting views through the window of their house,[19] could not, in my judgment, possibly have caused the jury to conclude that in fact the arson was committed by persons other than the three confessed arsonists.

(9) *Transcripts of Charles Allen's testimony in* United States v. Boffa.

The government concedes that the transcript of Charles Allen's testimony in *United States v. Boffa,* a federal criminal trial conducted in Delaware in 1981, was not disclosed to the Alberici defense prior to defendant's trial. That transcript shows that on cross-examination Allen testified, *inter alia,* that he had in the past committed murder for hire, and that he had perjured himself in court proceedings on many occasions.

■ The government argues that the Allen transcript was not *Brady* material because its substance was, or easily could have been, known to the defense prior to trial. Whether or not a defendant should reasonably have discovered exculpatory evidence cannot affect the government's duty to disclose such evidence. *See United States v. Agurs, supra,* 427 U.S. at 110–11, 96 S.Ct. at 2401. And while actual knowledge of Allen's testimony in the *Boffa* case would negate any due process argument based on the non-disclosure of that testimony, *cf. United States v. Starusko,* 729 F.2d 256, 262 (3d Cir.1984), the record does not support the inference that defendant or his counsel in fact knew the substance of Allen's testimony.[20]

This portion of defendant's motion nevertheless fails because Allen's *Boffa* testimony is not material under *Bagley.* The testimony is material only if there is a reasonable probability that disclosure would lead to a different outcome.

Allen's testimony does not satisfy this standard, for two reasons. First, Allen's testimony did not connect defendant to the scheme to burn the Jerry Lewis Theatre. Consequently, evidence which generally impeached Allen's veracity did not cast doubt on defendant's guilt save in the indirect sense that the very arson itself was called into question. Second, Allen was cross-examined at some length regarding his extensive criminal career. Tr. Jan. 13, 1983 at 28–34. From this cross-examination, the jury must have been fully aware that Allen was someone who had spent his adult life in a world dominated by violence, theft, and deceit. *See id.* at 33–34. As heinous as are the deeds that Allen acknowledged in his *Boffa* testimony, their commission could not come as a surprise to anyone who heard Allen's testimony at defendant's trial.

■ Either of these two factors—Allen's failure directly to connect defendant to the fraudulent scheme, or his trial testimony regarding his long career in crime—would arguably compel the conclusion that disclosure of the *Boffa* testimony does not give rise to a reasonable probability of a different result. Taken together, they surely compel that conclusion.

(10) *Teplick's failure to identify either Fardella or Allen in a photographic spread.* Theodore Teplick, who allegedly sold the arsonists the chemical agents used in the arson, failed to identify any of the

---

**19.** The agent's notes of the Merrills' statements, which defendant introduced into evidence at the hearing on his new trial motion, indicate that the Merrills did not identify any particular features of the person or persons whom they saw. Rather, both William Merrill Jr. and William Merrill III simply describe a white male of medium build who wore jeans and a light pullover shirt. Gladys Merrill is less specific, stating that she saw three men, all of whom were white males roughly thirty years of age.

**20.** Defense counsel's examination of Allen at trial never made mention of instances in which Allen had committed either perjury or murder. Thus, counsel's statement (made at the hearing on defendant's motion) that he had known the substance of Allen's *Boffa* testimony is not credible. *See* Tr. Feb. 14, 1985 at 9–10.

arsonists when shown a photographic display sometime in 1979. The evidence introduced at the hearing on defendant's motion establishes that defense counsel had this information prior to defendant's trial,[21] and nevertheless successfully urged that Teplick be barred from testifying due to his presence in court while other witnesses testified. Defendant's *Brady* claim as to this information is therefore meritless.[22] *See United States v. Starusko, supra,* 729 F.2d at 262.

(11) *Cumulative Effect of the Non-disclosed Evidence*

I have now determined that each of the particular *Brady* arguments which defendant raises is without merit.[23]

▪ I have already outlined in some detail the evidence brought forward at trial. That evidence is, as I have said, overwhelming as to two central propositions: (1) the Jerry Lewis Theatre was purposefully burned, and (2) the arson was committed by Ditizio, Allen, and Fardella. Taken together, defendant's list of asserted *Bra-*

*dy* violations do not call these propositions into question.

Similarly, the non-disclosure of those items which potentially go to Ditizio's credibility are, taken together, constitutionally harmless. Here, my determination is based in large part on the fact that the items in question were mostly duplicative of information the defense already possessed prior to trial. *See supra* text at 671–674. Defense counsel knew, for example, that Ditizio had medical difficulties that required large amounts of medication; that information was used skillfully at trial. In addition, defense counsel knew that Fardella had in the past stated that he and Allen committed the arson by themselves; this too was brought out at trial. The added effect of the items discussed *supra* text at 671–674, could not, in my judgment, have affected the outcome.

B. *Newly Discovered Evidence—The Krow Report*

In support of his motion for a new trial, defendant submitted the report of Dr.

---

**21.** Defendant testified that he learned of this information from an investigator's report which he obtained after the trial from his trial counsel. Tr. Jan. 31, 1985 at 29–31. Defendant further testified that trial counsel did not obtain any documents for him after the trial. *Id.* at 30–31.

**22.** Defendant argues that Teplick's failure to identify the purported arsonists is significant because it would tend to corroborate the Merrills' statements concerning the arsonists. The argument is at best highly speculative. Teplick saw the photo spread some two years after the fire, Tr. Jan. 21, 1985 at 22 (testimony of Agent Lory), and he testified at the hearing that he saw the individuals who purchased the inflammatory chemicals only twice. His failure to make the photographic identification is thus very weak support for the proposition that Fardella and Allen lied about the composition of the conspiracy.

**23.** On June 26, 1985, long after the conclusion of the hearing on defendant's motion, defendant submitted a letter brief which raised two additional *Brady* issues. First, defendant argues that documents he recently obtained pursuant to an FOIA request show that a written report of Fardella's August 1981 interview was prepared. This report, defendant argues, shows that at the August 1981 interview Fardella stated that the Jerry Lewis Theatre was not burned in order to

collect insurance. Second, defendant contends that a July 1981 report on the Jerry Lewis Theatre investigation shows that the government suspected Fardella of having committed some seventeen different crimes.

Assuming *arguendo* that both of these discoveries represent evidence favorable to the defendant, they also represent evidence that is not material in the sense that *Bagley* defines it. As I have stated earlier, Fardella's testimony in no way linked defendant to the Jerry Lewis Theatre arson; in fact, Fardella testified that he had been told that another party had arranged for the fire. *See supra* text at 675. In light of his testimony (or lack thereof) regarding defendant's complicity in the fraudulent scheme, the additional effect of a past statement denying that the fire had been designed to collect insurance proceeds would have been very slight. I reach the same conclusion regarding the government's suspicion that Fardella may have been involved in a list of seventeen crimes. Even assuming that such suspicion is itself *Brady* material, its disclosure could not have affected the outcome in this case. Fardella's testimony did not inculpate defendant except insofar as Fardella helped establish that an arson involving himself, Ditizio, and Allen took place on August 6, 1977 at the Jerry Lewis Theatre. And his testimony concerning the essential facts about the arson and its participants was amply corroborated by Ditizio's and Allen's testimony.

Grant Krow, a chemist whose services defendant has retained since his trial. Dr. Krow's report states that, based on his professional judgment, the chemical agent used to burn the Jerry Lewis Theatre was not naphtha but phenol. In addition, Dr. Krow states that had 110 gallons of naphtha been used on the building, as Allen testified at trial, the resulting explosion would have completely destroyed the theater and damaged surrounding property as well. The damage to the theater was not, in Dr. Krow's view, of the magnitude that would be expected to result from the ignition of 110 gallons of naphtha. *See* Krow Report (Exhibit 21 to Defendant's Motion for a New Trial).

 Under Rule 33, newly discovered evidence does not call for a new trial unless, *inter alia,* the evidence would probably produce an acquittal. *United States v. Iannelli,* 528 F.2d 1290, 1292 (3d Cir. 1976). Even if taken in combination with defendant's *Brady* materials, Dr. Krow's report does not meet this standard. The report addresses a collateral issue—the amount and nature of the substance used to burn the theater—and says nothing regarding defendant's complicity in the fraudulent scheme. Accordingly, even assuming it were accepted in a subsequent trial, its effect falls well short of the probable acquittal standard of Rule 33.

### C. *The Connection Between the Mailing and the Fraudulent Scheme*

Defendant argues that the mailing alleged in count five of the indictment—the only count on which his conviction stands—

is insufficiently connected with the fraudulent scheme to support a conviction under the mail fraud statute. *See United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). The government, in response, contends both that this portion of defendant's motion is untimely under Rule 33 and that it is wrong on the merits.[24]

 The letter in question was sent by Bertram Horowitz, an insurance adjuster hired by defendant, to the Curley Adjustment Company (Curley), which had represented Safeguard Insurance Company (Safeguard), one of the insurers of the Jerry Lewis Theater. The evident purpose of the letter, according to defendant, was to correct Curley's underestimate of the loss caused by the Jerry Lewis Theater fire. This purpose is of course closely connected with the principal aim of the fraudulent scheme—to collect as much as possible on defendant's insurance policies for the theater fire. Accordingly, I find defendant's *Maze* argument without merit. *See United States v. Lebovitz,* 669 F.2d 894, 896–99 (3d Cir.), *cert. denied,* 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982).

### IV. CONCLUSION

For these reasons, defendant's motion for a new trial will be denied. An appropriate Order accompanies this Memorandum.

---

**24.** It is clear that this portion of defendant's motion, which is not based on any newly discovered evidence, is untimely under Rule 33. Fed.R.Crim.P. 33 (establishing seven-day time period for filing of motions other than those based on newly discovered evidence); C. Wright, *Federal Practice and Procedure: Criminal 2d* § 558 (1982). If defendant could raise this argument in a petition under 28 U.S.C. § 2255, however, there is good reason to consider the merits of the issue: As with defendant's *Brady* arguments, there is no sense in requiring defendant to refile his motion for the sole purpose of changing the label on the cover page. *See supra* note 12.

The parties have neither briefed nor argued the question whether defendant would be free to raise this ground for reversing his conviction collaterally. Because I find defendant's argument wholly without merit, it would be a poor use of judicial resources to decide that question. Accordingly, I presume, for purposes of this decision, that defendant could raise this argument in a section 2255 petition. I will further treat defendant's motion as if it had in fact raised this issue pursuant to section 2255, and proceed to dispose of it on the merits.